# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 93-CA-00152-SCT

*BOB KELLY, INDIVIDUALLY AND AS CHAIRMAN OF CITIZENS AGAINST LEGALIZED LIQUOR*

*v.*

*CITY OF ABERDEEN, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/12/93 |
| TRIAL JUDGE: | HON. FRANK ALLISON RUSSELL |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | GEORGE S. WHITTEN SR |
| | T.K. MOFFETT |
| ATTORNEY FOR APPELLEE: | JEFFERY M. NAVARRO |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 9/5/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/26/96 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This is an appeal of the Monroe County Circuit Court decision upholding the validity of the local option election legalizing the use, possession and sale of alcohol within the city limits of Aberdeen, Mississippi. Bob Kelly, individually and as chairman of Citizens Against Legalized Liquor, relying on a published newspaper article as the latest official census, objected to the validity of the election on the basis that the population of Aberdeen was less than 7000. The City of Aberdeen, relying on the statement of the Census Bureau that the 1980 census figures were the latest official census results, maintained that it had the requisite population to hold the election. Because we find that the 1980 federal census was controlling under Miss. Code Ann. § 67-1-14 (1990), the circuit court decision upholding the validity of Aberdeen's local option election is hereby affirmed.

¶2. On October 20, 1990, the Mayor and Board of Aldermen of Aberdeen, Mississippi determined that the City of Aberdeen was qualified to hold an election on whether it could legalize the use, possession and sale of alcohol within the municipality pursuant to Miss. Code Ann. § 67-1-14 (1990). The voters in the municipality subsequently elected to permit the sale, receipt, storage and transportation of alcoholic beverages in the City of Aberdeen, Mississippi on November 13, 1990.

The election was certified by the Board of Aldermen.

¶3. Bob Kelly, individually and as chairman of Citizens Against Legalized Liquor, filed a Bill of Exceptions in the Circuit Court of Monroe County arguing that the City of Aberdeen was not permitted to hold a local option election under § 67-1-14 since the preliminary 1990 census figures, printed in several local newspaper articles, indicated the population of Aberdeen to be less than 7,000. The City of Aberdeen acknowledged that 1990 preliminary figures showed a population of less than 7,000. It maintained, however, that the 1980 census, which showed a population greater than 7000, was controlling in this matter because the results of the 1990 census were merely preliminary figures and not final until April 1, 1991. The circuit court entered judgment on January 12, 1993, concluding that the election was valid since the latest federal census was the 1980 census.

¶4. The sole issue presented by this appeal concerns which census was controlling under Miss. Code Ann. § 67-1-14 (1990) to determine whether the City of Aberdeen was entitled to hold a local option election. Section 67-1-14 provides the qualifications necessary for a municipality to vote on whether the sale of liquor will be legal within the city limits despite its location in a dry county. The Mayor and Board of Aldermen of Aberdeen determined that the City was qualified to hold such an election under § 67-1-14(2)(a) which states:

> Any municipality in this state having a population of not less than seven thousand (7,000) **according to the latest federal census**, all or any portion of which is located within five (5) miles of the Tennessee-Tombigbee Waterway or the Bogue Chitto River and which is located in a county which has voted against coming out from under the dry law may, at an election held for the purpose under the election laws applicable to such municipality, either prohibit or permit the sale, and the receipt, storage and transportation for the purpose of sale, of alcoholic beverages.

(emphasis added). Kelly argues that the trial court erroneously concluded that the election was valid based on the 1980 census figures. The City concedes that the preliminary 1990 figures showed a population of less than 7,000, and it even acknowledges that the final census figures released in 1991 showed a population of 6873, but it maintains that reliance on the 1980 census at the time of the election was proper, especially in light of the affidavit submitted by Paula J. Schneider, Chief of the Population Division of the Bureau of the Census, which stated the 1980 was the last **official census** at the time of the election because the official results of the 1990 census were not released until April 1, 1991.

¶5. This is a case of first impression as there are no Mississippi cases dealing with this particular aspect of the statute in question. After a thorough review of the numerous cases from other jurisdictions cited in the briefs, we find that the reasoning in *Lewis v. Lackawanna County*, 50 A. 162 (Pa. 1901) should govern the particular circumstances of this case. The issue in *Lewis* was whether a district attorney should have been paid a greater salary for his previous eight years in office based on a statute which provided a certain salary when the population of the County exceeded 150,000. 50 A. at 162-63. Based on growth figures revealed in the 1900 census, Lewis argued that the population undoubtedly exceeded 150,000 by the year 1892. *Id.* at 163. Although the statute in *Lewis* failed to make reference to the federal census as the guidepost for population determination, the court concluded that the latest federal census, the 1890 census, was the legal and official figure of

population under that state statute because it was the most competent evidence of population, and because it would ensure "correctness, uniformity, and the avoidance of duplication," as well as prevent "intolerable inconvenience and confusion." ***Id***.

¶6. The same reasoning used by the ***Lewis*** court applies to the facts of the case at hand. The legislature obviously included the words "according to the latest federal census" in order to avoid confusion and provide a definite benchmark for determining whether a municipality located in a dry county could legally conduct a local option election. As long as the census is subject to possible correction for miscounts, which would have been the case had Aberdeen relied on the newspaper articles submitted by Kelly,[1] then there is the danger that a city would have to later declare the local option election invalid. Future election results from local option elections based on preliminary numbers would merely be a source of intolerable inconvenience and confusion. To promote stability, uniformity, and the avoidance of confusion and duplicate efforts, municipalities must rely on the official results of the latest federal census in determining whether it may hold a local option election under § 67-1-14(2)(a). The evidence introduced in the trial below indicated that the official results of the 1990 census were not released until April 1, 1991. Accordingly, we conclude that the 1980 census was the latest federal census under § 67-1-14(2)(a) at the time of the election.

¶7. In ***City of Detroit v. Nims***, 47 N.W.2d 4, 6 (Mich. 1951), the Michigan Supreme Court interpreted a statute which required the treasurer to distribute tax dollars on a per capita basis "according to the latest or each succeeding federal decennial census." The court concluded that the quarterly distributions could be based upon preliminary census figures. ***Id***. at 10.; *see **City of Rochester v. County of Monroe***, 462 N.Y.S.2d 939, 942 (N.Y. App. Div. 1983) (quarterly sales tax revenues from winter of 1980-81 properly allocated according to preliminary report of 1980 census); ***City of Nashville v. Kizer***, 250 S.W.2d 562 (Tenn. 1952) (allocation of tax dollars to cities should rely on census figures as soon as available).

¶8. In reaching this conclusion, however, the court noted that the distributions were made subject to further readjustments according to later adjusted census figures. ***Nims***, 47 N.W.2d at 6. Because the amount of distributions could be adjusted, the court noted that reliance on preliminary figures would not cause "disturbance of the orderly processes of government nor any hardship other than as may flow from a miscalculation of anticipated revenues." ***Id***.[2]

¶9. Unlike the situation presented in ***Nims***, there is no procedure in the case at hand for making minor adjustments to an election which turns out to have been illegally conducted. Other than complete invalidation of an election, there is no other means for adjusting an election to reflect a change in results indicated by the official promulgation of the census. Consequently, municipalities should rely on the latest official census results in the record which, in this case, were the results of the 1980 census. *See **Cato v. Chaddock***, 373 N.E.2d 172, 175 (Ind. 1978) (census results effective once governor receives official results thereby insuring uniform application of laws relying on census); ***Harralson v. State***, 71 So. 2d 79, 84 (Ala. 1953) (interpreting statute which referenced latest published census to require "final, correct, official, conclusive" figure); ***Varble v. Whitecotton***, 190 S.W.2d 244, , 246 Mo. 1945) (selection of petit jury in October of 1930 based on 1920 census was valid because courts only take judicial notice of official record of census and results of 1930 census had not been officially published).

¶10. In *Childers v. Duvall*, 63 S.W. 802, 803 (Ark. 1901), the Arkansas Supreme Court made similar observations regarding reliance on preliminary reports,

> So long as the enumeration of its inhabitants for that year was subject to the examination and revision of an officer, it was not the census. The work that was to make it such was not finished. Until the law authorized the announcement of the enumeration as the census, no official notice of it as such could be taken; and, until official notice could be taken of it, no election or appointment could be based upon it.

¶11. Kelly contends that there is no interest in stability and uniformity in this particular case since Aberdeen held "perhaps [the] only [election] up to this point" under § 67-1-14. Kelly, however, fails to account for the fact that the same dispute might arise every ten years if this Court fails to require finalized results from the Census Bureau. Although 13 U.S.C.A. § 7 (1990) authorizes the Bureau of the Census to publish "preliminary and other census bulletins," use of these figures would not cure the problems of uncertainty. Therefore, preliminary census bulletins are simply not controlling under § 67-1-14. *But see* **Herndon v. Excise Board**, 295 P. 223, 224 (Okla. 1931) (allowing preliminary results to control because the law expressly permitted the supervisor to publish preliminary results).

¶12. The phrase, "latest federal census," in Miss. Code Ann. § 67-1-14 (1991) requires a municipality to rely on the latest official promulgation of results from the Bureau of the Census. Although the parties in this dispute and the facts of this case fail to delineate which exact documents constitute official results, the weight of the evidence indicated that the 1980 census was the latest official census at the time of the election because the official results of the 1990 census were not released until April 1, 1991. Because the 1980 census showed the population of Aberdeen to be greater than 7,000, the local option election held on November 13, 1990 was valid under § 67-1-14. Accordingly, the decision of the Monroe County Chancery Court upholding the local option election in Aberdeen is hereby affirmed.

¶13. JUDGMENT AFFIRMED.

**LEE, C.J., SULLIVAN, P.J., PITTMAN AND BANKS, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, P.J., AND ROBERTS, J. MILLS, J., NOT PARTICIPATING.**

**SMITH, JUSTICE, DISSENTING:**

¶14. This is nothing short of an attempt by the City of Aberdeen to sneak in under the wire and conduct a liquor referendum using 1980 census figures. The city knew full well that 1990 preliminary population results indicated that the city had insufficient population under the statute to even conduct a liquor referendum. Nevertheless, the city choose to circumvent the law and hold a liquor referendum prior to the "officially released" new census data. In this first impression issue, the majority adopts the minority view of our sister states with which I cannot agree and therefore, must dissent.

¶15. Miss. Code Ann. § 67-1-14 (Supp. 1990) required at least a population of 7,000 for cities to hold a local option election. The 1980 census showed Aberdeen to have a population of 7,184 residents. However, the preliminary figures made public from the 1990 census showed a population of only 6,771. The preliminary 1990 figures had been released by the Bureau of Census, properly and legally published, all in accordance with the "latest federal census." Aberdeen's population decline, as shown by the new 1990 census, were of obvious public notoriety due to the four publications in the local newspaper. In a hurried attempt to get around the new census figures, the city fathers claimed the old figures under the 1980 census were controlling.

¶16. We must first answer the question of what is the Legislature's intent as to which census should control, the 1980 or 1990 census. The use of the word "latest" in the Mississippi Code Ann. § 67-1-14 (Supp. 1990), indicates that the 1990 census figures, even though preliminary, should control. The 1990 census should also be controlling under Section 67-1-14, enacted after the 1990 decennial census date. In *City of Detroit v. Nims*, 330 Mich. 239, 47 N.W. 2d 4, 9 (1951), the court held that legislative intent, when ascertainable, is the guiding star. That court, addressing the use of the word "latest census" in the Michigan statute, also noted that the use of the word latest "disclosed a clear intent . . . distributions should be made on a basis as nearly in accord with actual population as possible."*Id*. at 9. The Michigan court thus gave immediate effect to a preliminary report (released August 1, 1950) of the 1950 census results, rather than wait some eight more months until the "official" results were filed.

¶17. In *Forde v. Owens*, 160 S.C. 168, 158 S.E. 147,148 (1931), according to statute, the compensation of the mayor and councilmen of the City of Columbia could double whenever it was determined by the "last preceding published United States Census" that the city's population had attained 50,001. The preliminary publication announced by the Board of Census were 50,195. The city officials certified that the city had exceeded the numerical amount of population required by the South Carolina statute and began drawing salaries at twice the rate previously received. The city officials were promptly challenged. The South Carolina Supreme Court, in holding that the governing officials did not act too soon, noted that the census was "published" when the results were made known "by bulletins published in the newspapers". . . and that it was "not necessary to wait" until there have been compiled and bound certain volumes constituting the final official report of the Bureau . . . to the Secretary of Commerce. *Id*. at 150.

¶18. In *Board of Com'rs of Lorain County v. City of Elyria*, 174 Ohio St. 135, 21 Ohio Ops. 2d 393, 187 N.E. 2d 33 (1962), where a village and a city joined in petitioning to annex part of the village to the city, the Secretary of State proclaimed that the village had already grown in excess of 5,000 residents according to the latest 1960 census, and was therefore, now a city, not a village. *Id*. at 33-34. In holding that this information met Ohio's statutory language requiring the Secretary of State to act when the census count was "officially made known to the Secretary of State," the court found that this informal certification by the Director of the Bureau of Census was sufficient. *Id*. at 35. The court noted that the Secretary of State did not have to wait "until the final official declaration of the census [w]as sent to him." *Id*. Newspaper legal publications are informal channels, but the focus is the authority of the source, and the source is the Bureau of Census. If preliminary released figures were considered "official" in *City of Elyria*, they most definitely should be considered the "*latest*" census under Miss. Code Ann. § 67-1-14.

¶19. In ***State ex rel. Retonaz v. Mitchell***, 115 S.W. 1098 (Mo. App. 1908), the Missouri Court of Appeals considered the eligibility of a city, based upon population, to opt for a liquor law that may or may not have been identical or different from that chosen by the county. The county held an election on March 7, 1908, which was held improper because a local census completed February 7, 1908, showed that the city had a population sufficient enough to qualify under the same statute to conduct its own city election on enacting a local option law. ***Id.*** at 1100.

¶20. This issue is not confined to this century. The case of ***Nelson v. Edwards***, 55 Tex. 389 (1881), as in Aberdeen, involved a county that was losing population. The county had a public office of tax collector and elected a tax collector during November 1880 elections. The census of 1880 showed a decline in population sufficient to drop the county to a class where the sheriff was to be both sheriff and tax collector. The final census figures had not been released and thus the dispute arose. The court, in finding that the enumerator's preliminary list filed in the office of the county court, was sufficient evidence of the 1880 population, held that the 1880 census governed as to whether the county should elect a tax collector or whether such position was no longer necessary. 55 Tex. at 393. The court invalidated the November 1880 election.

¶21. ***State ex rel. Clark v. Board of Education of City of Salina***, 148 Kan. 632, 84 P. 2d 507 (1938), is also analogous to the case at bar. A city in Kansas attempted to beat the new census by conducting a vote of a school bond the month prior to the new census being officially published. The court followed the principle of practicality rather than formality and held that the most recent census should guide the city's decision despite the fact that it had not been published officially. The most recent census was the most recently taken census. ***Id.*** at 508-09.

¶22. In ***City of Rochester v. Monroe County***, 93 A.D. 2d 625, 628, 462 N.Y.S. 2d 939, 941 (N.Y. App. Div. 1983), the New York appeals court noted no "statutory requirement that the final tabulations be in any particular form or book. Once the census figures are broken down into counties, towns, wards, etc., and are released to the public by an authorized official, the census is complete for all practical purposes." ***Id.***

¶23. The principle derived from all of these cases is simply that "a new census should be given effect when preliminary figures are made public by those authorized to disseminate such figures." ***City of Elyria***, 187 N.E.2d at 35; *see also* ***State ex rel. Clark,*** 84 P. 2d 507(1938). Preliminary census figures filed three months prior to an election, by the enumerator authorized to file them, governed the county's power to hold that election. ***Nelson v. Edwards***, 55 Tex. 389, 392 (1881).

¶24. Finally, the majority hangs its hat, as did Aberdeen, on the caveat that preliminary "population counts are subject to correction for undercount or overcount." This caveat is appended to every 1990 census report to comply with a stipulation resulting from litigation against the Bureau by some of the nation's largest cities. ***City of New York v. U. S. Dept. of Commerce***, 739 F. Supp. 761 (E.D.N.Y. 1990) (*rev'd on other grounds in* ***Wisconsin v. City of New York***, 116 S.Ct. 1091 (1996); *see* ***State of New Jersey v. Apportionment Com'n,*** 125 N.J. 375, 593 A.2d 710, 711 (N.J. 1991). The majority claims that this caveat requires that a ten and one-half-year-old census should remain the controlling "latest" census until at least April 1, 1991, or at most until July 15, 1991, the date when the census becomes "official." This same argument was raised and soundly rejected in ***State of New Jersey*** in which the Court held that even where the New Jersey Constitution used the phrase, "official

decennial census," the figures released to the Governor months before either the July 15th or April 1, 1991, deadlines should be considered official and be acted upon by state officers. *State of New Jersey*, 125 N.J. at 382, 593 A.2d at 714.

¶25. The Oklahoma Supreme Court, in *Herndon v. Excise Bd. of Garfield County*, 147 Okla. 126, 295 P. 223 (Okla. 1931), considered a case where the City of Enid, according to preliminary census figures released on May 3, 1930, was entitled to and did establish a city court. The governing board, claiming that the 1920 census controlled and that the 1930 census was "not complete, nor officially declared," refused to pay the salary of the new judge. *Id.* at 223. The preliminary announcement of the 1930 census figures contained a caveat that "these figures are preliminary and subject to correction." *Id*. The initial figures were subsequently corrected after May 3, 1930, but the preliminary announcement was one the Board was required to take notice of and be guided by. *Id.* at 224.

¶26. Preliminary census figures still subject to correction had similar force and effect in *Ludwig v. Board of County Comr's of Sarpy County*, 170 Neb. 600, 103 N.W. 2d 838 (Neb. 1960); *Excise Bd. of Washita County v. Lowden*, 189 Okla. 286, 116 P. 2d 700 (1941); *Elliott v. State ex rel. Kirkpatrick*, 150 Okla. 275, 1 P.2d 370 (Okla. 1931); and *Holcomb v. Spikes*, 232 S.W. 891 (Tex. Civ. App. 1921).

¶27. In the case at bar, Miss. Code Ann. § 67-1-14 (Supp. 1990) did not require that the census be "official," only that it be the "latest" census governing population count in Aberdeen for purposes of a city holding a local option liquor referendum. Therefore, the 1990 census should be controlling under § 67-1-14 which became effective June 2, 1990, after the 1990 decennial census date.

¶28. Even considering the caveat, the Census Bureau, on July 22, 1991, announced that no adjustment to Aberdeen's preliminary population figures, made public by publication during August, September, and October of 1990, would be made to the final "official" figures. This was so in spite of the Bureau's admission that two per-cent of the population was not counted.

¶29. I respectfully dissent.

**PRATHER, P.J. AND ROBERTS, J., JOIN THIS OPINION.**


1. Not only did the preliminary figures contain the caveat that they were subject to adjustment, but the newspaper articles were actually urging citizens to contact the Census Bureau if they believed they had not been counted in the 1990 census so that more definite figures could be obtained.

2. In a review of prior cases on this issue, many of which have been cited by the parties in the case *sub judice*, the *Nims* court made the following observation:

> It is not surprising that . . . courts, in determining the jurisdiction of courts, or the validity of the drawing of juries or of the appointment or election of public officials, have rejected the date of enumeration as the time as of which the statutory effects of a changed population status shall become operative, and, instead, have accepted for that purpose some subsequent date when census results were published or became known, inasmuch as to do otherwise would result in a period of chaos and confusion, between those two dates, during which the jurisdiction of courts and the validity of proceedings would be in doubt, incapable of immediate ascertainment.

*Id*. at 8. Although the court was alluding to the time period between the taking of the census and the publication of results, instead of the time difference between preliminary publications and the official promulgation of results as in the case *sub judice*, the same reasoning of avoiding confusion applies. Reliance on preliminary figures would simply create a period of chaos and confusion as to the validity of a local option election.

The *Nims* court actually made the following observation with respect to the reliance on preliminary figures instead of official figures:

> Whether, in such cases, the change of status resulting from reaching a certain population level were to be held in effect as of the date of a preliminary bulletin as distinguished from the date of final promulgation of results, or vice versa, however, would make little practical difference ordinarily, **unless the preliminary report disclosed a figure so near the dividing line as to cast doubt what the final result might be.**

(emphasis added). *Id*. at 8 . Although reliance on preliminary figures might normally make little difference in the end, the facts of this case revealed that the preliminary figures released in the newspaper were so close to the dividing line set forth in the statute (7,000) that reliance on preliminary figures would have made a practical difference and cast doubt on what the final result of the census might have been. In the interests of avoiding this doubt in future local option elections, the official promulgation of results is the proper benchmark for determining whether a municipality is entitled to hold a local option election under § 67-1-14(2)(a).